Good morning, everyone. The first argued case this morning is number 162599, Enplas Display Device Company against Seoul Semiconductor Company. Mr. Rosenstock. Good morning, and may it please the court. I'd like to focus my argument today on the two issues of active inducement of infringement and damages. There is a fundamental lack of evidence in the record to support key elements of the jury's verdict on those issues and the court's ultimate judgment. But the point, the real point that I think was continually stressed was that there was no contrary damages expert. Is that correct? It is correct that there was not a contrary damages expert in the district court, Your Honor, yes. So what is the jury supposed to do or the judge if there's no contrary evidence? Well, what happened at trial was that SSC's damages expert, Ms. Davis, gave an opinion that an appropriate lump sum royalty for the products that were accused of infringement would be $70,000 for the 209 patent and $500,000 for the 554 patent. And so the maximum permissible amount of damages that could be awarded based on the evidence in the record for the infringement that was proved at trial is $570,000. But she also said that a total overall license might cost such and such. But what concerns me is that nobody said otherwise. No expert. No. I mean, this really is the problem with the jury trial, particularly, is it not? How is the jury to know what to believe if you're only given one version? Well, of course, the jury was given two versions. They were given the version for the actual infringement that was proved at trial, and then they were given a version eight times higher that would include a royalty on products that were not shown to infringe at trial. And with an expert who testified as to the reason for those two numbers and no contrary evidence. Right. But the problem with the higher number is that it's based on a legally irrelevant set of facts. Of course, we did object. We made a Dawbert motion to try to exclude the testimony. We made a motion in Lemonade to try to exclude the testimony. There was plenty of objection made to prevent the jury from hearing the legally irrelevant testimony. And then, of course, on Jamal, we repeated the objection. But was there contrary evidence? The point is that under Section 284, the damages statute, damages are supposed to be adequate to compensate for the infringement. And what we have here is a set of facts in which money is being paid for products that are not infringing, that have not been shown to infringe. And so even if one assumes that, as the expert testified, that in the real world, it would be practical and people might have an interest in trying to do what she called a freedom to operate license, where they would negotiate a license for the entire portfolio of products so as to avoid having to figure out whether the other products do or do not infringe. That can't be a proper basis for patent damages where only a subset of the products have been shown to infringe. The law permits the so-called hypothetical negotiation, which could very well and is assumed, I think, to estimate damages over whatever the parties might agree to for the life of the patent. Well, for the life of the patent, for the use made of the patent of the invention by the infringer, which in this case was limited to a small subset of the licenses. I would direct the court's attention to the AstraZeneca case, which we cite in our brief, which is one in which there was a Hatch-Waxman case. There was a patent period. Then there was a pediatric exclusivity period, which is an FDA period in which generic competition is not allowed. There were sales of the drug made during the pediatric exclusivity period, and the district court awarded patent damages, royalty damages for the sales that were in that period. This court reversed that, saying that one cannot award patent damages for sales after the expiration of the patent. There might be some other form of damages, but they're not properly done as patent damages. There was the same kind of expert testimony in that case, where the expert said, look, in a hypothetical negotiation, of course, they wouldn't negotiate to stop paying the royalty at the expiration of the patent, because there's a de facto monopoly that extends an additional six months because of the FDA exclusivity period. I take it your point, then, is that if the $4 million, even if it's an accurate number for the freedom to operate license, it still has to be allocated towards infringing and non-infringing products. That's correct, and only the infringing products are a proper basis for the patent damages here. It's not as if there wasn't evidence in the record as to what that was. The expert was very clear that $470,000 was the maximum permissible number for that infringement. So the jury was not left to guess at what the proper amount should have been. Your point is that, as a legal matter, regardless of any factual issues and whether there was a damages expert on both sides or just one, as a legal matter, that part of the damages verdict was erroneous. That's correct, Your Honor, and so it should be sent back for a trial without that erroneous information in the record. Without that legally irrelevant information excluded. You said you were going to talk about inducement. If we were to agree with you on inducement, would we reach damages? No, it would not be necessary to reach damages if the court were to find no inducement. That's correct. Let's turn to your other point. Yes, so on the topic of inducement, there's a failure of evidence showing a specific action to cause infringement in the United States and the specific intent to cause infringement in the United States, which is a necessary predicate to the inducement finding. So the facts are that EDD, our client, makes these tiny little plastic lenses in Asia. Those lenses are sold in Asia to companies that make products known in the industry as light bars. Those light bars have LED lights. The lenses are placed on top of the lights in a sort of a box configuration, which is ultimately used as part of the backlighting element for television, flat panel television products. So the light bar manufacturers take EDD's lenses, put them into light bars. The light bars are sold again in Asia to television manufacturers, and the television manufacturers then have distribution networks that go worldwide. And so from EDD's point of view, when it is selling these products in Asia to an Asian company, knowing that they will be sold again in Asia to other Asian companies, it is in no way directing its conduct toward the United States. It's in no way encouraging the use of the product in the United States. It's in no way manifesting an intent that the product be used in an infringing manner in the United States. Your client knew that the product could end up in the United States because your client had, what, 50% of the market and knew that it was selling to customers that might sell to the U.S.? But is it your point that knowledge isn't enough? Knowledge is not enough. And I think for the greatest part of the time in which the sales at issue were made, there's even a question about knowledge because there was, you know, for all my client knew, its lenses, because, for example, the patentee is another supplier of these similar lenses. So for all they knew, the TV manufacturers took the lenses from SSC and used them for the U.S. televisions and took our client's lenses and used them for the European and African televisions. So what would your position be if, in fact, they had demonstrated, perhaps they did, that a certain percentage of this product did, in fact, was, in fact, placed in product that was sold in the United States? Let's say that they had established that. I think that would also not be enough, Your Honor. And I think the most helpful analogy that I've been able to think of is the doctrine of contributory infringement as it was expounded by the Supreme Court in the Grobster case. So what we know about contributory infringement is that it is a way of imputing intent. So if a product has no substantial non-infringing use, then the courts say that it is fair to assume that a person who sells that product in the United States intends that it will be used for an infringing purpose. Unless they prove otherwise. This is really my question. Let's say that they had established that there were infringing uses in the United States. Right, but as long as there are substantial non-infringing uses, which is to say as long as there are uses anywhere else in the world, then it would be improper to impute the intent. Do you have any authority for that? I don't think that's the law. Well, I think that's the law. I think that the argument that the other side is making, if the sales were happening in the United States, would be a much stronger argument. But it certainly is the law that as long as there is a substantial non-infringing use for a product, then... And you know there are infringing uses, you still can't collect damages for the known infringing uses? If there are other uses that are non-infringing? Well, again, if we're limiting ourselves now to the inducement context, there has to be a specific intent to cause infringement. And the specific intent to cause infringement that the other side is trying to establish is based on the fact that the product was designed in a way that if it ultimately made it to the United States and was used, it would infringe. But our point is that it's also that it's not proper to infer an intent that the product be so used when there are many other non-infringing uses. And that if one wants to establish inducement under those circumstances, it's necessary to show some affirmative act directing the conduct to the United States. And so if one looks... They think your case is like power integrations or MEMC. And how do you distinguish those cases? I distinguish those cases, Your Honor. I was just going to point to power integrations because in that case, even there, the court said it was a close call as to whether there was enough conduct directed to the United States. But there we had... And the product at issue there were computer chips that controlled power supplies. The chips had been designed to meet U.S. energy standards. The accused infringer competed for business that it knew was directed exclusively to the U.S. It provided demonstration boards with infringing chips to customers in the U.S. The website enabled customers to find a U.S. distributor for the product. It maintained a technical support center in the United States to service U.S. customers. And its standard terms and conditions provided an indemnity for patent infringement in the United States. And that whole constellation of activities directed toward the U.S., even that was a close call, the court said. And here we have none of it, literally none. We have zero evidence of any activity directed toward the United States. The same thing is true in MEMC. There there was a case where there was a Japanese customer and an ultimate customer in Austin, Texas. And there was evidence that the accused infringer had visited the customer in Austin, Texas, had given test materials to people in Austin, Texas, had essentially tried to close the deal by providing technical support and information to the people in Austin, Texas. And it was that set of communications that ultimately the court... And again, we have absolutely none of that here. So on the record before us, it would not be proper to find a specific intent necessary for inducement. I see that I'm in my rebuttal time. Yeah, we'll save your rebuttal time. Let's hear from the other side. Thank you. Mr. Gatz. Good morning, Your Honors. I'll turn first to damages since we spoke of that first. This is a plain, vanilla, lump-sum, paid-up license damages theory here, which is trying to be cast as something else. As Your Honors noted, Ms. Davis testified there was no rebuttal evidence to that. And she testified that the parties would engage, enter into, in hypothetical negotiation, a paid-up, lump-sum license for the very kinds of reasons that were pointed out, for example, in Lucid, the pragmatic concerns, the decisions... Doesn't it cover all potential products, not just the products found to infringe? Isn't that her testimony? Her testimony, Your Honor, is that she did not assume the other products infringed, but the license would be a lump-sum, paid-up license under the patent, which is every time that I've seen, unless I've not found a case yet where this was... No, no, I get you. I mean, the hypothetical negotiation, they're not going to go in and say, we're just going to pay for these. We're going to buy a license for this patent, a one-time lump-sum license. Don't you still, in a proper damages calculation, in an infringement case, have to allocate the damage of that lump-sum license between the products that it infringed and anything else that license may cover? Well, Your Honor, I wouldn't use the word allocate. What I would say is this. Your hypothetical negotiation must take into account the commercial circumstances, which is we know certain products infringe, but then we have to use our valuation tools to decide how the parties coming in would have valued that license. As this court said in Lucent, sometimes you win, sometimes you lose on these, right? Is the license for only the infringing products, or is it for other things? It's a lump-sum, paid-up license under the patent. So in theory, other things could be covered if, in fact, they win it. But that's just in the same circumstance, Your Honor, where in Lucent and other cases where you never know when you get a paid-up, lump-sum license whether you're going to be using it or not. That's the reason you enter into it. How can this not violate AstraZeneca, which says that the royalty base has to be limited to the infringing products? Actually, AstraZeneca is, I think, an entirely different case, and I'll explain why. It's a running royalty case, 50 percent running royalty. And they had in that case, they said, we are going to charge a running royalty on products after the expiration of the patent. Here, the license is the license that is entered into as a lump-sum at the time. What if we conclude that a royalty should be limited, the royalty base should be limited to just the accused infringing products? What if we conclude that? Then what is your response? Well, my first point is it was. Your Honor, I think if that was the conclusion, then you would have to go to the fallback damages position. But I don't believe that. But I believe that's exactly what happened. Ms. Davis assumed infringement only of the infringing products and then put herself in the hypothetical negotiation. At that point in time, she then concludes that in that hypothetical negotiation, how would the parties have valued this infringement, right? So she says they would have liked to have had certainty, so let's add $3 million so that maybe other products might possibly infringe in the future, so we'll just add $3 million or however much it is. But that's not based on the royalty base of products that were found to infringe, right? Well, I don't think she just had the – Your Honor, she started with the royalty products that were found to infringe and then she did an analysis of the market. She didn't say, let's pick $3 million. It was a full-blown analysis, which isn't challenged as to how she came up with the $4 million. And what I had, Your Honor, in footnote 7 of AstraZeneca, this court reserved on an issue which I think addresses Your Honor's concern, which is it said that, okay, you cannot in AstraZeneca, you cannot get post-expiration royalties on a running royalty basis. That runs afoul of decades of Supreme Court precedent. But it said we are reserving, this court, Your Honor, said that we are reserving as to whether the valuation of the royalty rate can depend on the fact of other circumstances such as these other post-expiration sales. So this court actually has acknowledged that you can look at it in the context of the rate or in this case, as Ms. Davis did, it has acknowledged the possibility you can look at it in the context of a rate. Ms. Davis says, I'm going to determine the license for the infringement here and that license is going to be valued based upon the overall commercial circumstances. As in Lucent, sometimes you win, sometimes you lose. Lucent says you may not use it at all, but you're still paying a value. To rule otherwise, I do believe, Your Honors, would have to conclude that you can never have a lump sum paid-up license under a patent, as in Lucent and Summit 6 and Vernetics, because all of those licenses, none of those licenses are product-specific. They were all licenses which are paid-up licenses entered into at the day of the hypothetical negotiation. They don't say we're only licenses for the products that were designed. They know that you could, in theory, in those cases, have had a situation where the day the judgment came down or the day of the hypothetical negotiation, the party got out of the business and never made another product, in which case they would have been paying all that money simply for something that never got used. But that's the very nature of a lump sum paid-up license, which this Court has condoned, namely that sometimes you value it at the hypothetical negotiation, assuming only infringement of the products that are infringed. There are going to be times where you may have overvalued it. There are times where you may have undervalued it. In those times where you overvalue it, you are, by definition, paying for products that would otherwise have not been found to infringe. It's really no different, and it's exactly what was contemplated in Footnote 7 of AstraZeneca. And this Court, as far as I know, has never said that a lump sum license must be a field-limited license to specific products. Given that that's not how the parties would have agreed and negotiated, the parties have undisputed evidence, and the parties would not have, on day one, entered into such a license such that every day they offer a new product, they've got to go to our client and say, now we'd like another license under this new product. These are custom products that are made in and of, and you would have to determine that in each and every case. So instead, Ms. Davis gave undisputed and certainly substantial evidence as to how she would value the license that would have been entered into as a consequence of the infringement as a lump sum paid-up license, which takes into account the commercial circumstances. It's not, as she said, assuming, which is the primary basis of EDD's argument, it's not assuming the other products infringe, it's instead valuing that license on the infringed products as of the day of hypothetical negotiation. Okay, so we have no further questions. I'll turn to the inducement issue now. The question of inducement, there's no issue of direct infringement, one of the predicates to inducement, there's no issue that EDD engaged in the conduct that is required, the inducing conduct, they work directly with customers, they were involved on a virtually daily basis, they offered specifications. When you say they work directly with customers, are you talking about the foreign customers that they sold their backlights to? Correct, correct, Your Honor. And they did so, so that's the inducing conduct, and they did so, frankly, it's a bit astounding to say they had no knowledge, that's the fundamental argument in their brief at page 53 and page 26, and even in their gray brief at 22, is that they had no knowledge that the products were making their way into the United States. Well, they certainly had knowledge, they had more than knowledge, they had a letter from SSC saying, we found your products. What about intent? I mean, to me, the more difficult issue for this court is the intent question. So we clearly have, I think, substantial evidence of intent on this record. It's always circumstantial, as Your Honor, they're almost always circumstantial. What is that evidence? So, Your Honor, first of all, for starters, in the beginning and throughout the relationship, SSC informed EDD three to five or more times, as the record says, that it had patents, which it considered to be covering the SEDD products, and that's at A15258. So that's knowledge of the patents. Knowledge of the patents and knowledge of the assertion that those patents would be infringed. That's the record as well. They were informed of that. They were told the patents are fundamental to EDD's product. That's A15751. They were told in several instances that the patents would be infringed by the EDD lenses. Couple that now with what EDD knew was happening with its lenses. And this is how we can talk about direct knowledge, which is the letters put them on direct knowledge in the subsequent meetings, that these very lenses that EDD is holding. That's still just knowledge. Where is the specific intent that they intended to do infringement in the United States by having the manufacturer import them into the United States? The type of evidence identified in power integrations. Well, we have, I think, a different character of evidence, which I think is even more supportive of the global tech standard for willful blindness. The patents were very much on EDD's radar, as I know, Your Honor. But SSE informed EDD's customers of the patents. EDD regularly was meeting with those very same customers whom it knew was shelling into the United States. And the evidence in the record is clear that EDD knew its customers were ultimately selling direct screen TVs, flat screen TVs in the United States. EDD knew it had 50% of the world marketplace. EDD knew its lenses had become the industry standard. That's A15118119. EDD admitted at trial that it would be surprised, it would not be surprised to learn that its lenses were sold in the United States. That's at A15294. EDD put no restrictions on its customers and made no inquiries. Didn't they also say, and it's part of that same testimony, that we didn't put any restrictions. We didn't say don't sell in the U.S., but we didn't tell them where to sell. And they sell worldwide. That's correct, Your Honor. And that's the same sort of burying your head in the sand that global tech makes clear as willful blindness. Did you argue willful blindness? We did, Your Honor. It's in our briefs and it's cited. And in fact, what I was just about to say is EDD's briefs give virtually no recognition to willful blindness. But, yes, we argued it. It was instructed to the jury. The jury instruction was not refuted. And this is at the very – there's direct knowledge, we believe, of infringement based on the letter and then the subsequent conduct. That's certainly direct knowledge from which you can infer intent given that we told them they infringed. You're using knowledge to infer intent, knowledge of the patent, knowledge that ultimately some of their products ended up in the U.S. as a way to show that they intended for their customer to sell their product in the U.S. I'm using knowledge to infer – I'm using knowledge to recognize knowledge of the patent but also knowledge that they were told that they were infringing to infer intent. So it went further than just saying we know you know about the patent. We told them – we told them in the letter in October 2013, for example, we found your products in the U.S., we think you're inducing infringement. Couple that with the – that was in the letter. Couple that with the conduct, right, which is what they're doing and they're continuing to do. And, for example, you know – Willful blindness, I thought that was something that would really go to knowledge more than intent. You know, intent, you need to have some sort of maybe affirmative act in order to intend for your product to be sold in the U.S. What's – what do you have here besides for your willful blindness in terms of how they stuck their head in the sand in knowing that the product was going to be sold? Thank you. Two points. The first point, and I think willful blindness under global tech actually is directly a surrogate for intent. In other words, what they say in global tech is that willful blindness is, you know, virtually the same thing as intent. Global tech doesn't deal with intent. It deals with knowledge. It talks about the reckless. Reckless is not enough. Your psychological is not enough. But that global – that intent is – it can be inferred based on willful blindness. I don't think it's strictly a knowledge, Your Honor. I think the willful blindness is a test for intent as well, and you can infer intent from the knowledge here in any event. But the conduct, Your Honor, goes even further. Once they know – they have 50 percent of the market. Once they know it's fundamental, once they know they've been told their products, if sold in the U.S., would infringe and are covered by our patents, they make no attempt to investigate, even though they're meeting with these very customers. Their regular practice is to disassemble products, and they don't try to do that. Their regular – they offer no evidence that they tried to determine they didn't infringe. All of these are the indicia of exactly the kind of willful blindness that global tech is designed to address, which you can't bury your head in the sand. You can't do a deliberate failure to investigate. Here, not only do they actually know – not only are they actually told you're infringing in the U.S. and inducing infringement in the U.S., they also knew all these other circumstances, which suggests that they clearly knew or should have known that we're willfully blind to the fact that products were coming into the U.S. with this knowledge of the patents that have been espoused for years. And that is sufficient under global tech. And frankly, intent is always – almost always – very rarely does somebody admit that they intend something. Intent is almost always – Well, like in MEMC and power integrations, there were things there that showed that the accused infringer was taking affirmative acts in the U.S., for example, or for the U.S. sales. For example, in power integrations, the accused infringer was designing the product in a way to meet U.S. specifications and requirements. In MEMC, they were providing customer support in the U.S. They were reaching out to the ultimate customer in the U.S., having conversations with them, visiting them. There's no evidence of any sort of contact here between the accused infringer and the U.S. So, Your Honors, I think while we have a different set of facts, these are, frankly, more compelling facts because we are with this knowledge and this comprehensive sensitivity to the fact of infringement. They know they've got 50% of the market. They're meeting with these very customers. When you say these very customers, you're saying that they're meeting with the foreign customers. Foreign customers, knowing where those products are going. Knowing that, among other places, the products could end up in the U.S. Well, they know their customers are, in fact, introducing flat-screen TVs in the U.S. They have 50% of the market. They have the fundamental technology, and so you're right. Did you show that they were the exclusive supplier to these customers? They were not exclusive as far as we know, Your Honor. There was no evidence that they were exclusive to those customers. Well, how would they infer that they were necessarily going to be encouraging their customers to ship into the United States? Well, let's look at this from two angles. In global tech, even, there was evidence that the infringer copied a U.S. product, right? So, yes, but the only issue in global tech is whether they knew about the patents, not whether they knew the products were going to the U.S. Right, but in discussing it, one of the factors they used in looking at willful blindness was the fact that they specifically copied a U.S. product. Right. There's no evidence of that here. I know you keep saying your case is stronger. I think you have some inferential facts that weigh on your side, but to say that it's stronger than these cases, I think, is a little bit of an overstatement. I think it's stronger than knowledge. You have the notion on knowledge, yes. I mean, it's undisputed about the knowledge, but the only facts that I've heard you say are that they have knowledge of the patent, they have knowledge that the manufacturers that they sell to do ship into the United States, and they have 50% of the market. But you have no other facts like the facts found in power integration that show their contact with the United States. So, if I might, and I know I'm close to over my time, but I might answer this question, Your Honor. First of all, one thing we have to understand is we have actual direct knowledge here based on the letter that they were told of the patents and that they're inducing infringement in the U.S. So, in that regard, we don't even go to willful blindness. But power integration does tell us to look at the totality of the circumstances, right? And there we have, in addition, as Your Honor, I think, noted, facts from which you could infer willful blindness. And that's all we need is a substantial evidence test. You know, and here we have the jury. The jury ruled on that substantial evidence with direct knowledge based on the letter and inferential knowledge, as Your Honor knows, of the fact that it's likely that they would be – that they could have likely presumed that their products were coming to the U.S. and they buried their heads in the sand as Bogotex says they shouldn't do. Was there contrary testimony or evidence that, no, we didn't know about it? Or, no, we don't know where it goes? There was testimony at the trial record. Their witnesses said that they didn't have definitive information about where they go. But the substantial evidence weighs on the other side based on the actual letter. We told them, we opened up products in the U.S. and we found your products and you're inducing and you need to stop. And then couple that with an all-along, given the high sensitivity of the patents, told that you're infringing knowing that they have a big part of the world market, knowing that their products of their customers are making their way into the United States, is other substantial evidence which you can infer. Willful bias in direct, in addition to the evidence of specific intent, which you can infer from the letter itself. Okay, any more questions? Thank you. Ms. Bales, five minutes. Thank you, Your Honor. Starting with the damages issue, we're certainly not saying that you can't have a lump sum royalty award. But all of the cases in which this court has approved lump sum royalty damages have been where the lump sum covers future sales of a product shown to be infringing. In the Lucent case, for example, there were three specific software packages at issue. And there was a question, it's true, the court said sometimes you win, sometimes you lose, because you don't know which products are going to be a hit and have huge sales and which products may not do so well. But there's never been a case that we found, and they have not cited any, in which an expert has been permitted to base a lump sum royalty on a royalty base that includes products not found to be infringed. With regard to footnote seven of AstraZeneca, what the court said there was that it was not going to decide the question whether it would be permissible to adjust the royalty rate for the period of infringement in order to take account of later sales in the pediatric exclusivity period. The court certainly did not approve of that practice. The court said it was not going to reach the question. And in any event, that's not what happened here. What happened here, as the record is very clear, is that their economist did a calculation in which she said the lump sum paid up royalty for future sales of all the products accused of infringement is $570,000. And then she went on to say you should multiply that by a factor of eight because there are other products that it would be convenient to include in that same hypothetical negotiation. But if the court were to approve that, you would be opening a Pandora's box of hypothetical negotiation. Because why stop there? Why not throw in other patents that might be of interest? Maybe they'd like to have peace on all patents forever. Why stop there? Why not add in trademark? I mean, there are all kinds of disputes that could be resolved in a hypothetical negotiation. But the point of the statute is to provide damages for the infringement. Could you address your colleague's arguments about willful blindness under Global Tech? Yes. Why don't these facts here support that effort? Well, of course, the question of willful blindness, as Joe Stoll correctly pointed out, is an alternative way of proving knowledge, essentially satisfying the knowledge requirement. So it doesn't go to intent. There wasn't a question of intent at issue in Global Tech. Global Tech was an issue in which, as Your Honor said, Judge Hughes, there was a copying of the U.S. product. The copier claimed that it didn't know the product was patented. But since every other product in that industry was patented, the court said you can't get away with putting your head in the sand about the existence of the patent or not. But that's not at all what we have here, where at most we have a situation. First of all, there's a question about knowledge. The testimony of trial was we know that we sell to light bar manufacturers who sell to TV makers who sell all over the world. There are multiple sources. We're not the exclusive supplier. Maybe they end up in the U.S. Maybe they don't. We don't know. It's true that at some point the other side sent us a letter saying, hey, we found some of your TVs in the U.S. But our point is that even knowing, and this is very clear under this court's DSU medical court, which is an en banc decision of the court, that mere knowledge of possible infringement by others is not enough amount to inducement. And instead, inducement requires evidence of culpable conduct directed to encouraging another's infringement and not merely that the inducer had knowledge of the direct infringer's activities. What if you were the 100% supplier of this product and you turned it over to the manufacturer? I think even if we were the 100% supplier of this, manufacturer of this product, that would not change things because we could intend that our stuff be used outside the United States even knowing that there was a chance that some of it might end up in the United States. We're not encouraging them to use it there. What if the only market for this product was in the United States? That would be a difference. So if the only market for the product were the United States, then I think we would have a problem because then I think that exactly the logic of the contributory infringement cases that I alluded to would apply. So if there's no other place that these can be used except in the United States, then it would be fair to infer that when we sold them, we intended that they be used in the United States in an infringing manner. But that's not the fact here. And in fact, it's entirely all the record shows is that we sold these products in Asia to Asian companies intending for all the world knows that they be used exclusively outside the United States. We don't have a duty to warn our customers not to sell these things to the US. And even if we had done that, that wouldn't be effective because our customers also don't sell to the United States. They sell to other companies in Asia. So it sounds as if what the other side wants to do is to create a duty on us to go to our customers' customers and warn them, don't put our products in any TVs that are destined to the United States. And there's not a single case of this court that puts an affirmative duty on a company to warn others not to infringe. All we have to do is refrain from inducing. We have to refrain from encouraging. We have to refrain from reaching out to the United States and promoting our products here. And we didn't do any of that. Any more questions? Thank you. Thank you both. The case is taken under submission.